Filed 10/16/23  P. v. Smith CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | |
|    Plaintiff and Respondent, | G061111 |
|    v. | (Super. Ct. No. 17CF2082) |
| JOSHUA DEAN SMITH, | O P I N I O N |
|    Defendant and Appellant. | |

Appeal from a judgment of the Superior Court of Orange County, Scott A. Steiner, Judge.  Affirmed.

Gene D. Vorobyov, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Arlene A. Sevidal, Andrew S. Mestman and Susan Elizabeth Miller, Deputy Attorneys General, for Plaintiff and Respondent.

\*          \*          \*

# INTRODUCTION

The jury convicted Joshua Dean Smith of second degree murder and made a true finding on a knife-use enhancement. He was sentenced to a prison term of 16 years to life. His primary defense at trial was that he acted in self-defense. Smith, who has been diagnosed with autism spectrum disorder, argues the trial court erred by instructing the jury that it could not consider evidence of any "mental disease, defect, or disorder" in determining whether his belief in the need to defend was reasonable.

We affirm without deciding whether the trial court's self-defense instruction was erroneous because, we conclude, any instructional error was harmless. In order to claim self-defense, a defendant must have used no more force than was reasonably necessary under the circumstances to defend against the danger. In response to an unwanted sexual advance, Smith stabbed the victim, who was unarmed, 31 times. The amount of force used was, by any measure, so excessive that it is not reasonably probable the jury would have reached a result more favorable to Smith had the trial court been permitted to consider evidence of any "mental disease, defect, or disorder" that Smith might have.

Smith also argues the trial court abused its discretion under Evidence Code section 352 by permitting his former girlfriend to testify that he laughed whenever he talked about stabbing the victim and that he had threatened to kill her if she ever reported him to the police. The trial court did not err by permitting this testimony because it was probative of consciousness of guilt and of whether Smith had an actual belief in the need to defend and the testimony's probative value was not outweighed by any probability its admission would create substantial danger of undue prejudice.

FACTS

I. *Evidence of Guilt*

In December 2016, Smith was living in a sober living home in Fullerton. He was romantically involved with L.R. who was also living in a sober living home in Santa Ana.

Dennis Tran lived with his wife, his older sister and her family, and his parents in Westminster, near the Walmart where the homicide took place. Tran's sister had never seen Tran use drugs.

Smith and L.R. spent the evening of December 17, 2016 using methamphetamine and possibly heroin. L.R. returned to her sober living home by the 11:00 p.m. curfew, and Smith planned to return to his home. Smith called L.R. a little while later to tell her he had missed his bus and was going to go to the Walmart on McFadden Avenue in Santa Ana to charge his phone and wait until L.R.'s curfew lifted at 4 a.m.

At 2:45 a.m. on December 18, Smith called L.R. in a panic and told her that he had "fucked up." He said he "had killed somebody," he did not mean to do it, and did not know what to do. Smith was out of breath and L.R. could hear him vomit. L.R. told Smith to run to her sober living home and meet her outside.

When Smith arrived at L.R.'s sober living home he was shaking, in a panic, and covered in blood. He had a cut on his face. L.R. asked Smith what had happened. He said that while at the Walmart, Tran approached him and asked if he wanted to smoke some methamphetamine. Smith replied, "Sure, why not?" and went with Tran to the back of some storage containers behind the Walmart. While they were smoking methamphetamine and listening to music, Tran placed his hand on Smith's leg. Smith told L.R. that Tran was "trying to grab [his] dick." Smith told Tran to "back off" and said, "Dude, I don't swing like that." Tran replied, "Nobody does until they need some

dope." Smith told L.R. that Tran continued trying to touch him, pushed him down, and tried to get on top of him, so Smith stabbed him.

After stabbing Tran, Smith took money, methamphetamine, and zig-zag papers from his pocket. Smith told L.R., "that fucking guy only had $15.00 on him."

L.R. helped Smith get rid of his bloody clothing by putting it in different trash cans, brought him a clean shirt, and went with him to Walmart or Rite Aid to buy him shorts. L.R. cleaned Smith's bloody knife by soaking it in bleach.

Smith and L.R. then went to a convenience store to buy some cigarettes. Outside of the store they took some "selfies" of themselves hugging and kissing. In the alley behind the convenience store they used the methamphetamine Smith had taken from Tran. L.R. asked Smith why he had stabbed Tran. Smith said he "just lost it" and went into a "blind rage." Smith said he pulled out his knife, a switchblade with a three-inch blade, and stabbed Tran over and over again until he stopped moving. Smith never said he was afraid for his life.

A Walmart security guard called 911 after discovering Tran in the parking lot bleeding. Tran was still breathing when police officers arrived. He was transported to a hospital, where he died as a result of multiple stab wounds. He had been stabbed 31 times. Stab wounds to his back perforated the chest cavity and upper lobe of the lung. Two stab wounds to the chest perforated the heart. Tran's postmortem drug test results were positive for methamphetamine and presumptively positive for ecstasy; the results showed recent use.

Tran was 42 years old and 5 feet 5 inches tall. He weighed 165 pounds. No weapons were found on him. At the time of the homicide, Smith was about one month shy of 22 years old, weighed a little under 200 pounds, and was very muscular.

Smith and L.R. lived in Smith's car for several months and then traveled to Washington state, where they lived with Smith's father and aunt. While in Washington,

4

Smith and L.R. spoke often about the stabbing. Anytime they spoke about it, Smith laughed.

Smith threatened to kill L.R. if she ever reported him to the police for the stabbing. Despite this threat, L.R. spoke with a police investigator in April and June 2017.

II. *Testimony Regarding Autism*

At trial, Smith called Betty Jo Freeman, Ph.D., a clinical psychologist and professor emerita of medical psychology as a witness. Dr. Freeman, whose specialty was the development of criteria for diagnosing autism, testified that autism results from a destruction in brain development, is present at birth, and "does not go away." Dr. Freeman conducted a developmental history interview with Smith's mother, reviewed Smith's psychiatric records from 2005 to 2015, and performed diagnostic tests on Smith. Dr. Freeman confirmed a previous diagnosis that Smith has autism spectrum disorder.

Dr. Freeman testified that autism is a group of neuro developmental disorders that result in disruption of brain development. Autism manifests in specific types of behavior. To make a diagnosis of autism, the expert must find the subject has symptoms in two areas. The first area is social communication skills. People with autism have difficulty learning social communication skills. For example, people with autism might have problems maintaining a conversation with others or understanding and responding to nonverbal cues. People with autism might have difficulty making friends and knowing appropriate behavior in social settings.

The second area of symptoms is called "restrictive interest" and "repetitive behaviors." For example, a person with autism might be afraid of loud noises or being touched or might not respond to what is going on in the environment in the same way a typical person would. Dr. Freeman testified: "When a person with autism, for example, walks into this room, they see everything in this room you and I might focus on. What's

5

relevant right now.  They often get overwhelmed with sensory stimulation.  They often have odd mannerisms.  They get stuck on thinking about the same things over and over again.  And if [they] are talking to someone, they may not pick up on the cue you really don't want to hear that anymore."  Other symptoms of autism include difficulties with executive functioning skills (emotional regulations), controlling impulses, planning, and organization.  People with autism have difficulty learning from experience.

Autism affects daily life by limiting a person's ability to use normal intelligence in day-to-day situations.  Autism is a life-long condition, though symptoms may change over time.  People with autism must be taught social skills that typical people learn naturally.  For example, a person with autism might be taught how to solve problems, control emotions and impulsivity, and read and respond to nonverbal social cues.

## DISCUSSION

I. *Background*

Smith asserted the defenses of perfect and imperfect self-defense to the murder charge.  He argues that the trial court erred by instructing the jury it could not consider evidence of his diagnosis of autism spectrum disorder in deciding the merit of his claim of self-defense.

During discussions regarding jury instructions, the trial court stated it would instruct the jury on justifiable homicide and self-defense using CALCRIM No. 505.  At the prosecution's request, the trial court instructed the jury with a modified version of CALCRIM No. 505.  The relevant parts of the instruction given, with the modification in italics, are:  "The defendant acted in lawful self-defense if, one, the defendant reasonably believed that he was in imminent danger of being killed or

6

suffering great bodily injury or was in imminent danger of being raped;"[1] "the defendant reasonably believed that the immediate use of deadly force was necessary to defend against that danger;" and "the defendant used no more force than was reasonably necessary to defend against that danger." "When deciding whether the defendant's beliefs were reasonable, consider all the circumstances as they were known to and appeared to the defendant and consider what a reasonable person in a similar situation with similar knowledge would have believed. If the defendant's beliefs were reasonable, the danger does not need to have actually existed. [¶] *However, if you conclude that the defendant had a mental disease, mental defect, or mental disorder, you may not consider that evidence in determining whether the defendant's purported beliefs were objectively reasonable. And you may not consider that evidence in determining whether the defendant used no more force than was objectively reasonable*." (Italics added.)

Smith's counsel objected to the special instruction on the ground it had been incorporated into other instructions. Smith's counsel agreed the instruction was a correct statement of law.

The trial court used CALCRIM No. 571 to instruct the jury on imperfect self-defense. That instruction states that a killing that would otherwise be murder is reduced to voluntary manslaughter if the defendant kills due to imperfect self-defense. The instruction states that a defendant acts in imperfect self-defense if the defendant (1) actually believes that he or she is in imminent danger of being killed or suffering great bodily injury and (2) actually believes that the immediate use of deadly force is necessary to defend against the danger, but (3) at least one of those beliefs is unreasonable.

---

[1] Rape would not be an accurate description of the imminent danger that Smith might have faced. (See CALCRIM No. 1000.)

During closing argument, the prosecutor referred to the instruction and Dr. Freeman's testimony to argue: "You are not considering . . . what the reasonable person [would] do if they also suffered from autism. That's not part of the objective standard. You are also not permitted to consider what the reasonable person [would] do if they suffered from autism and were high on meth at the time."

## II. *Forfeiture*

The Attorney General argues Smith forfeited his challenge to the self-defense instruction because his counsel did not object to it on the ground it misstated the law and agreed the instruction was correctly stated of the law. We find no forfeiture. An objection is not required if the defendant asserts the instruction is incorrect in law and affects the substantial rights of the defendant. (Pen. Code, § 1259; see *People v. Smithey* (1999) 20 Cal.4th 936, 976, fn. 7 ["Defendant's claim, however, is that the instruction is not 'correct in law,' and that it violated his right to due process of law; the claim therefore is not of the type that must be preserved by objection"].)

Smith asserts the self-defense instruction was incorrect in law, and we conclude the instruction affected his substantial rights. If Smith forfeited his challenge to the self-defense instruction, we would address his challenge on the merits to avoid an ineffective assistance of counsel claim. (*People v. Crittenden* (1994) 9 Cal.4th 83, 146.)

## III. *Any Error in the Self-defense Instruction Was Harmless*

### A. *Relevant Law*

Self-defense may be "'perfect'" or "'imperfect.'" (*People v. Humphrey* (1996) 13 Cal.4th 1073, 1082 (*Humphrey*).) Perfect self-defense results in a defendant's complete exoneration while imperfect self-defense, by negating malice, means a defendant cannot be convicted of murder but can be convicted of manslaughter. (*Ibid.*)

For a killing to be in perfect self-defense, the defendant "'must actually *and* reasonably believe in the necessity of defending oneself from imminent danger of death or great bodily injury.'" (*People v. Thomas* (2023) 14 Cal.5th 327, 386; Pen. Code, § 197, subd. (3).) Thus, a defendant's belief must both subjectively exist and be objectively reasonable. (*Humphrey, supra*, 13 Cal.4th at p. 1082.) The defendant's fear must be of imminent danger of death or great bodily injury. (*Thomas,* at p. 386; see CALCRIM No. 505.) By contrast, imperfect or unreasonable self-defense arises when a defendant acts with a subjectively honest but objectively *unreasonable* belief that he or she is in imminent danger of death or great bodily injury. (*People v. Simon* (2016) 1 Cal.5th 98, 132.) Imperfect self-defense is not a true defense but a form of voluntary manslaughter. (*People v. Barton* (1995) 12 Cal.4th 186, 200.)

For both perfect and imperfect self-defense, the right to self-defense is limited to the use of force that was reasonably necessary under the circumstances to defend against the danger. (*People v. Minifie* (1996) 13 Cal.4th 1055, 1065; *People v. Pinholster* (1992) 1 Cal.4th 865, 966, disapproved on another ground in *People v. Williams* (2010) 49 Cal.4th 405, 459; CALCRIM No. 505; see *People v. Morales* (2021) 69 Cal.App.5th 978, 995 [defendant cannot claim imperfect self-defense if defendant used more force than was reasonably necessary].)

### B. *Forfeiture*

Smith identifies an issue in this appeal as "[w]hether the trial court erred in instructing the jury that it may not consider Smith's autism and resulting symptoms in deciding whether his belief in the need to use self-defense and *how much force to use* was reasonable." (Italics added.) But Smith does not specifically argue the jury should have been permitted to consider evidence of autism spectrum disorder in considering reasonable use of force—as opposed to a reasonable belief in the need to use force. He refers throughout his appellate briefs to his "belief in the need to use deadly force" and to

9

"the objective prong" or "the objectiveness prong" or "the reasonableness prong" of self-defense. Self-defense has two objective prongs—reasonable belief in the need to use force and use of no more force than was reasonably necessary—and those two prongs (we have called them components) are different concepts. Smith does not have a separate heading for reasonable use of force. The authorities he cites and those which we have discussed concern only reasonable belief in the need to defend.

Failure to develop an argument may result in its forfeiture. (*People v. Guzman* (2019) 8 Cal.5th 673, 683, fn. 7 ["Although defendant mentions due process in passing, he does not develop the argument, choosing instead to focus on his equal protection claim. We . . . hold that any due process claim has been forfeited"].) However, as we explain in the next section, if the trial court erred by instructing the jury it could not consider any "mental disease, mental defect, or mental disorder" Smith might have in determining whether he used reasonable force, the error was harmless.

C. *Smith Used Excessive Force*

Rather than address whether the self-defense instruction was erroneous, we shall assume instructional error. We first determine which standard of prejudice would apply. Smith argues the beyond reasonable doubt standard of prejudice of *Chapman v. California* (1967) 386 U.S. 18 (*Chapman*) applies because the modification to the self-defense instruction violated his constitutional right to present a complete defense. We disagree. The reasonable probability standard of *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*) applies. On that issue, *Humphrey* is on point: "Defendant contends that the instructional error unconstitutionally deprived her of her rights to present a defense and to equal protection of the laws, thus requiring reversal unless the error was harmless beyond a reasonable doubt. [Citation.] We disagree that the *Chapman* standard applies. The erroneous instruction may have adversely *affected* the defense, but it did not deprive her of the right to present one or deny her equal protection. In effect, the court

10

excluded some evidence as to one element of the defense. When the reviewing court applying state law finds an erroneous exclusion of defense evidence, the usual standard of review for state law error applies: the court must reverse only if it also finds a reasonable probability the error affected the verdict adversely to defendant." (*Humphrey, supra*, 13 Cal.4th at p. 1089.)

The court did not exclude evidence regarding autism spectrum disorder. Smith was permitted to present Dr. Freeman's testimony on that subject, and the jury was permitted to consider it in deciding whether Smith had an actual belief in the need to defend himself. The jury was instructed on self-defense and imperfect self-defense. The modification to the self-defense instruction adversely affected Smith's self-defense claim but did not deprive him of it.

The question under the *Watson* standard of review is whether "it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error." (*Watson, supra*, 46 Cal.2d at p. 836.) "There is a reasonable probability of a more favorable result within the meaning of *Watson* when there exists 'at least such an equal balance of reasonable probabilities as to leave the court in serious doubt as to whether the error affected the result.'" (*People v. Mower* (2002) 28 Cal.4th 457, 484.)

A defendant who used more force than was necessary under the circumstances cannot claim perfect or imperfect self-defense. "Our Supreme Court has made clear that 'not every unreasonable belief will support a claim of imperfect self-defense'; rather, a defendant can claim imperfect self-defense based only on a belief "that, if reasonable, would support a claim of perfect self-defense.' [Citation.] For example, if a defendant unreasonably believes someone is going to punch him in the arm and stabs him to death in response, 'this belief would not support a claim of imperfect self-defense for the reason that the belief, even if reasonable, would not permit the use of deadly force.' [Citation.] In such a scenario, the use of force would be excessive but still

11

would not reduce a homicide to voluntary manslaughter. Similarly here, if [the defendant] reasonably believed he needed to use force against [the victim] but used more force than was necessary, then he could not claim perfect self-defense. As a result, he cannot claim imperfect self-defense, either." (*People v. Morales, supra,* 69 Cal.App.5th at p. 995.)

Had the trial court not modified the self-defense instruction, there is no reasonable probability the jury would have returned a verdict more favorable to Smith because the evidence established that under any standard of reasonableness he used excessive force against Tran. L.R.'s testimony, accepted as true, was that Tran placed his hand on Smith's leg, tried to grab Smith's penis, pushed Smith down, and tried to get on top of him. This was, to be sure, a very aggressive sexual advance, but Smith's response—stabbing Tran 31 times—was far more than was necessary to repel it. Smith did not simply disable Tran and flee, but continued to stab him until he stopped moving, and then robbed him. Smith stabbed Tran five times to the head, 11 times to the back of the neck and upper back area, and 10 times to the chest. The stab wounds to the back perforated Tran's chest cavity and two of the stab wounds to the chest perforated Tran's heart. Smith told L.R. he "just lost it" and had gone into a "blind rage."

Smith could have deflected Tran without killing him. Tran was 42 years old, had no weapons, stood at 5 feet 5 inches, and weighed 165 pounds. Smith was 21 years old, weighed a little under 200 pounds, and was very muscular. Smith never told L.R. he had been afraid for his life.

The amount of force used by Smith was so far in excess of what was necessary to repel Tran, and so brutal, that permitting the jury to consider the evidence of autism spectrum disorder with regard to the objective components of self-defense would not, even under the standard of *Chapman*, have led the jury to find that Smith had used reasonable force. Nothing in Dr. Freeman's testimony might have led the jury to find

12

that stabbing Tran 31 times was a reasonable use of force under the circumstances by someone with autism spectrum disorder.

IV. *Smith's Claims of Evidentiary Error Have No Merit*

Smith argues the trial court erred by overruling his counsel's objections and permitting L.R. to testify that he laughed whenever they talked about the stabbing and that he had threatened to kill L.R. if she ever reported him to the police. Smith argues the probative value of this testimony was substantially outweighed by the probability its admission would create substantial danger of undue prejudice.

Under Evidence Code section 352, a trial court may exclude otherwise relevant evidence "if its probative value is substantially outweighed by the probability that its admission will . . . create substantial danger of undue prejudice." (*Ibid.*) Prejudice under Evidence Code section 352 means the evidence uniquely tends to evoke an emotional bias against the defendant individually and has very little effect on the issues. (*People v. Lopez* (2013) 56 Cal.4th 1028, 1059, disapproved on another ground in *People v. Rangel* (2016) 62 Cal.4th 1192, 1216.) Evidence is substantially more prejudicial than probative only if the evidence poses an intolerable risk to the fairness of the proceedings or the reliability of the outcome. (*People v. Eubanks* (2011) 53 Cal.4th 110, 144-145.) A trial court's decision to admit or exclude evidence pursuant to Evidence Code section 352 is reviewed for abuse of discretion. (*People v. Thomas* (2011) 51 Cal.4th 449, 485.)

When asked if Smith had ever laughed about having killed someone, L.R. answered he had done so "[j]ust once or twice." After her memory had been refreshed with the transcript of her preliminary hearing testimony, L.R. testified that she spoke with Smith a lot about the stabbing, and he laughed "anytime that we talked about it." When L.R. was asked whether Smith had ever threatened to kill her if she went to the police, she answered, "No. I don't think so. I don't remember." When her recollection was

refreshed with her preliminary hearing testimony, L.R. testified that Smith did threaten to kill her if she reported his involvement in the stabbing to the police.

L.R.'s testimony that Smith always laughed when talking about the stabbing and that he had threated to kill her if she reported him to the police was probative of consciousness of guilt. Evidence showing consciousness of guilt is generally admissible within the trial court's discretion. (*People v. Anderson* (2018) 5 Cal.5th 372, 391.) Although physical flight to evade custody or escape from custody are common and obvious examples of conduct showing consciousness of guilt, *any* conduct by a defendant after the commission of a crime and tending to show consciousness of guilt is relevant. (*People v. Pettigrew* (2021) 62 Cal.App.5th 477, 497.) "[T]here need only be some evidence in the record that, if believed by the jury, would sufficiently support the suggested inference [of consciousness of guilt]." (*People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 102.)

Laughing about having stabbed Tran tends to show that Smith knew he had not acted in self-defense but had committed a crime. For the same reason, evidence that Smith laughed about stabbing Trans shows that Smith did not honestly believe he needed to defend himself. Instead, laughing suggests that Smith took delight in stabbing Tran and found the incident to be a source of merriment rather than a reaction to an honestly believed threat of harm.

Evidence that a defendant made threats against a witness or someone to whom the defendant had made incriminating statements, if substantiated, is highly probative of consciousness of guilt. (*People v. Gonzalez and Soliz* (2011) 52 Cal.4th 254, 289; *In re Hardy* (2007) 41 Cal.4th 977, 1014.) Smith's threats against L.R. show too that Smith did not honestly believe he needed to defend himself but knew he had committed a crime by stabbing Tran.

The probative value of the evidence of Smith's laughter and threats against L.R. was not outweighed, much less *substantially* outweighed, by the probability its

admission would create substantial danger of undue prejudice. Smith argues the evidence might have led the jury to form an emotional bias against him as a bad or callous person. But the evidence of Smith's laughter and threats was no more inflammatory than the evidence of the charged offenses. (*People v. Ewoldt* (1994) 7 Cal.4th 380, 405.) The evidence was not cumulative—there was no other evidence of consciousness of guilt— and was reasonably necessary for the prosecution's case. (See *People v. Schader* (1969) 71 Cal.2d 761, 774 ["The chief elements of probative value are relevance, materiality, and necessity"].)

Smith argues that the evidence of his laughter was particularly prejudicial because the jury was not permitted to consider whether his laughter was a symptom of his autism. Dr. Freeman did not provide any testimony that would support an inference that Smith's laughing about a stabbing was a symptom of autism. Further, the jury instructions did not prohibit the jury from considering Smith's autism diagnosis in determining whether Smith had an honest subjective belief in the need to defend or in assessing whether his laughter was a symptom of autism spectrum disorder.


V. *Cumulative Error*

Smith argues cumulative error. We have found no error. We have assumed for purposes of analysis the trial court erred by instructing the jury not to consider Smith's autism in determining whether he used more force than was reasonably necessary under the circumstances. Even if we were to conclude that was error, a single error is not cumulative error.

DISPOSITION

The judgment is affirmed.


                                            SANCHEZ, J.

WE CONCUR:


BEDSWORTH, ACTING P. J.


GOETHALS, J.